

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

RECEIVED
JUN 29 2023
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

| | |
|---|---|
| SEALED | Case No. SEALED |
| Plaintiff-Relator, | **FILED UNDER SEAL** |
| -v- | **PURSUANT TO** |
| | **31 U.S.C. § 3730(b)(2)** |
| SEALED | |
| Defendant. | **JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**



SCANNED
JUN 29 2023
U.S. DISTRICT COURT MPLS

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

THE UNITED STATES OF AMERICA *ex rel.*
ANIMAL LEGAL DEFENSE FUND,

                    Plaintiff-Relator,

       -v-

HOLDEN FARMS, INC.,
                  Defendant.

Case No. 21-sc-02061 JRT/TNL

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT**

Table of Contents

I.      INTRODUCTION ................................................................................................... 1

II.     PARTIES ............................................................................................................... 9

   A.  Animal Legal Defense Fund .............................................................................. 9

   B.  Holden Farms, Inc. .......................................................................................... 10

III.    JURISDICTION AND VENUE .......................................................................... 10

IV.     APPLICABLE LAWS ......................................................................................... 11

   A.  The False Claims Act ...................................................................................... 11

   B.  The Minnesota Anti-Cruelty Law ................................................................... 12

   C.  The Minnesota Anti-Garbage Feeding Law .................................................... 14

   D.  The Federal Swine Health Protection Act ...................................................... 15

   E.  The Paycheck Protection Program ................................................................... 18

   F.  The PPP Loan Forgiveness Process ................................................................. 22

V.      SUBSTANTIVE ALLEGATIONS ...................................................................... 23

   A.  The U.S. Pig Industry and Holden's Business Operations .............................. 23

   B.  The Undercover Investigation ......................................................................... 28

   1.  Holden Neglects and Abuses its Sows and Piglets in Violation of the Minnesota
       Anti-Cruelty Act. .......................................................................................... 32

       a.  Holden Starves Mother Pigs and Keeps Them and Their Piglets in Deplorable
           Breeding Conditions ................................................................................. 33

       b.  Documented Incidents of Animal Cruelty ................................................ 35

       c.  Neglect and Lack of Treatment Cause Illness and Injury ......................... 35

       d.  High Mortality Rates ................................................................................. 38

   2.  Holden Employees Torment and Torture Piglets. ........................................... 39

       a.  Holden's Barbaric Castration of Piglets ................................................... 40

       b.  Delayed or Incomplete Euthanasia of Piglets to Save Money .................. 42

   C.  Defendant's Violation of SHPA and the Minnesota Anti-Garbage Feeding Law
       Creates Ongoing Risk to Public Health, Including to Consumers of Pork Products
       Derived from Holden's Pigs. .......................................................................... 43

   D.  Defendant Holden Farms, Inc. Knew that Its Conduct Violated a Material Term of
       Its PPP Loan .................................................................................................... 45

COUNT I .......................................................................................................................... 46

COUNT II ............................................................................................................... 47
PRAYER FOR RELIEF ...................................................................................... 49
REQUEST FOR TRIAL BY JURY ................................................................... 50

1.      Plaintiff and *qui tam* Relator the Animal Legal Defense Fund ("ALDF"), by and through its undersigned attorneys, brings this action on behalf of the United States of America ("the United States" or "Government") under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.      Relator seeks to recover treble damages and civil penalties from Defendant Holden Farms, Inc. ("Holden") arising from: (a) its false express certification that it was "not engaged in any activity that is illegal under federal, state or local law" made in an application for a $2.57 million Paycheck Protection Program ("PPP") loan the Government guaranteed and ultimately forgave; and (b) its false implied certification of such compliance through acceptance and retention of the loan proceeds and applying for loan forgiveness.

## I.  INTRODUCTION

3.      In response to the COVID-19 pandemic that ravaged the nation, Congress spent trillions of dollars in economic relief to address the devasting fallout. Among the most significant relief programs passed as part of this effort is the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Within the CARES Act is an economic stimulus program directed specifically at small businesses that is referred to as the Paycheck Protection Program ("PPP"). As of May 31, 2021, more than 10 million borrowers received more than $800 billion in taxpayer dollars through the PPP program.

4.      This case is against Holden Farms, a sophisticated pig breeding and growing operation, which successfully applied for and obtained a $2.57 million PPP loan in April 2020 from Compeer Financial, ACA ("Compeer"), guaranteed—and ultimately forgiven—

by the United States Small Business Administration ("SBA").

5.     The stated purpose of the PPP loan to Holden was to provide its business operations with payroll and other economic support so that it could continue to provide pork products for sale.

6.     To secure $2.57 million in PPP funding, Holden was required to, and did, certify that it "is not engaged in any activity that is illegal under federal, state or local law."

7.     But that certification was false. The evidence Relator uncovered, including through an undercover on-site investigation between November 4, 2019, and March 5, 2020, (*i.e.*, immediately preceding Holden's PPP loan application in April, 2020) at Holden's facility in Utica, Minnesota, establishes that at the time of its loan application, Holden was engaged in systematic and ongoing violations of the Minnesota anti-cruelty law, the Federal Swine Health Protection Act ("SHPA"), and the Minnesota anti-garbage feeding law.

8.     Relevant here, the SHPA and the Minnesota anti-garbage feeding law are designed to control the spread of zoonotic diseases which can spread to humans. The importance of these laws is reflected in the severity of the civil and criminal penalties that can be imposed for violations.

9.     If the SBA knew of Holden's illegal, unsanitary, and inhumane practices in breeding and raising its pigs for distribution and the attendant threat to food safety, the SBA would have been legally prohibited from guaranteeing, and ultimately forgiving, the PPP loan.

10.     For example, and as shown in the video screen capture below, the undercover

2

investigation found that Holden fed "garbage"—in the form of a smoothie-like mixture of pig feces and dead piglet body parts—to mother pigs. Lacking the necessary treatment equipment on-site, there is no question that Holden did so without heating and testing this "feedback mixture" as required by law. Holden thus violated the SHPA and the Minnesota anti-garbage feeding law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



4

11.     By failing to treat the feces and dead piglet part mixture to kill disease organisms, Defendant exposed and continues to expose the public to the risk of contracting various "zoonotic" infectious diseases. Zoonotic diseases include but are not limited to foot and mouth disease, African and classical swine fever, and ironically, COVID-19. In other words, Holden obtained funding from a government program made necessary by a zoonotic disease so that it could keep operating in ways that violate anti-garbage-feeding laws, which were designed to fight zoonotic disease.

12.     The investigation also revealed that Holden repeatedly and knowingly deprived and continues to deprive its pigs of food.

13.     Undercover video also captured Holden employees repeatedly engaging in cruelty and neglect of its pigs. Numerous documented incidents capture Holden's employees savagely beating its sows, manhandling piglets in "jokes" with coworkers, improperly and cruelly castrating male piglets with their bare hands, and cruelly botching euthanasia of both sows and piglets.

14.     The continuous neglect the animals suffer, which Relator's evidence places in stark view, results in catastrophic injury—including from untreated prolapses (with organs spilling out from pigs' vaginas) as shown in the video screen capture below.



15.    Holden's conduct also resulted in avoidable suffering and senseless death, with dead animals piled up by the dozens—their bodies left to rot and mummify in pens and hallways as shown in the video screen captures below.

6





16.     This gruesome display of animal cruelty is not only morally repugnant but also violates Minnesota's anti-cruelty laws.

17.     Holden is a family-owned company whose leadership team comprises several family members. It is inconceivable that this pervasive, open, and notorious conduct was not known at the highest levels of Holden management.

18.     Framed in terms of liability under the False Claims Act, these unconscionable practices rendered Holden's certification of compliance with federal and state laws false when it applied for and obtained a $2.57 million PPP loan, which the Government guaranteed and ultimately forgave. Further, these practices lay bare the hypocrisy of Holden's representations on its website of its commitment to "[c]ontinuing our legacy of leadership in the adoption of our industry's best practices for animal welfare, environmental stewardship and safe food production."

8

19.     By engaging in the conduct alleged above, with the full participation and awareness of Holden's supervisors and managers, Holden knowingly made false statements to Compeer and the SBA that (a) secured Compeer's approval of Holden's application for a PPP loan and (b) influenced the SBA to guarantee—and ultimately forgive—that loan.

20.     In turn, Holden knowingly caused false claims for payment to be presented to the SBA resulting in the SBA paying Compeer (a) an origination fee of $25,700 and (b) the full $2.57 million amount of the loan upon final approval of Holden's loan forgiveness application.

21.     Holden applied for forgiveness of its $2.57 million PPP loan in November, 2020, and received forgiveness of the loan on June 17, 2021.

## II.     PARTIES

### A. Animal Legal Defense Fund

22.     Relator Animal Legal Defense Fund ("ALDF") is a national animal advocacy group founded in 1979 as a 501(c)(3) not-for-profit organization. Its charitable mission is to protect the lives and advance the interests of animals through the legal system. To fulfill its mission, ALDF provides free legal assistance and training to prosecutors to assure that animal abusers are punished for their crimes, files high-impact lawsuits to protect animals from harm, supports tough animal protection legislation, fights legislation harmful to animals, and provides resources and opportunities to law students and professionals to advance the emerging field of animal law. ALDF is headquartered in Cotati, California, and pursues its mission through work nationwide.

9

**B. Holden Farms, Inc.**

23.     Defendant Holden Farms, Inc. ("Holden" or "Defendant") was established in 1876 and became a Minnesota corporation on December 31, 1970. Holden's registered office and principal place of business is listed as 12346 Hall Ave., P.O. Box 257, Northfield, MN 55057. Its Chief Executive Officer is listed as Barry W. Holden. Defendant Holden Farms, Inc. is one the largest pig production operations in the United States.

## III.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the allegations or transactions in this Complaint. Insofar as there has been any public disclosure, Relator qualifies under the FCA as an original source of the information on which the allegations of this lawsuit are based.

26.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process. Further, Defendant has at least minimum contacts with the United States.

27.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant is domiciled in Minnesota, has transacted and continues to transact business in the District of Minnesota, and the conduct alleged herein occurred in the District of Minnesota.

10

## IV.   APPLICABLE LAWS

### A. The False Claims Act

28.   The False Claims Act ("FCA") establishes liability to the United States for any individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1).

29.   "Knowingly" is defined to "mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

30.   "Material" is defined using an objective standard to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 577 U.S. 1214 (2016).

31.   Any person who violated the FCA during the time period relevant here is liable for a civil penalty ranging from at least $11,463 up to $22,927 for each violation, plus three times the amount of the damages sustained by the Federal Government. 31 U.S.C. § 3729(a) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of

11

1990 (28 U.S.C. § 2461 note; Public Law 104-410).[1] In the present case, Relator alleges that Holden is liable under the FCA for at least two violations and actual damages of approximately $2,595,700, resulting in total statutory penalties and treble damages of approximately $7.8 million.

**B. The Minnesota Anti-Cruelty Law**

32.    The Minnesota Anti-Cruelty Law provides in relevant part:

- "No person shall . . . torture, cruelly beat, neglect, or unjustifiably injure, maim, mutilate, or kill any animal . . . , whether it belongs to that person or to another person," Minn. Stat. Ann. § 343.21(1);

- "No person shall deprive any animal over which the person has charge or control of necessary food, water, or shelter," Minn. Stat. Ann. § 343.21(2);

- "No person shall keep any cow or other animal in any enclosure without providing wholesome exercise and change of air," Minn. Stat. Ann. § 343.21(3); and

- "No person shall willfully instigate or in any way further any act of cruelty to any animal or animals, or any act tending to produce cruelty to animals," Minn. Stat. Ann. § 343.21(7).

---

[1] Depending on the dates of the claims, FCA civil penalty ranges relevant here are as follows:

| FCA Civil Penalty - Effective Dates | Minimum | Maximum |
|---|---|---|
| Jan. 30, 2023 - | $13,508 | $27,018 |
| May 10, 2022 - Jan. 29, 2023 | $12,537 | $25,076 |
| December 14, 2021 – May 9, 2022 | $11,803 | $23,607 |
| June 20, 2020 – December 13, 2021 | $11,665 | $23,331 |
| March 1, 2019 – June 19, 2020 | $11,463 | $22,927 |

12

33.    The Anti-Cruelty Law is broadly applicable to all animals, including farm animals. Minn. Stat. Ann. § 343.20(2) (defining "animal" as "every living creature except members of the human race").

34.    Violation of any subdivision of Minn. Stat. § 343.21 is a misdemeanor, and any subsequent violation of subdivisions 1 or 7 within 5 years is a gross misdemeanor. Minn. Stat. Ann. § 343.21 Subd. 9(a).

35.    Importantly, the Anti-Cruelty Law does not provide any exemptions applicable to the facts alleged herein. More precisely, the law exempts farm animals from cruelty protections only for a limited number of specific practices, such as the prohibition on confining an animal "for public display purposes" in caging less than four times the length of the animal. Minn. Stat. Ann. § 343.21(8). Minnesota exempts farm animals from that prohibition by authorizing the "agricultural display of caged animals." *Id.* (exempting county and state agricultural societies and fairs, as well as livestock or poultry exhibitions).

36.    Similarly, the Anti-Cruelty Law allows a "person or corporation engaged in transporting livestock" to confine the livestock for up to 36 consecutive hours if the owner or custodian requests an extension in writing, § 343.24(2)(b), and also allows for tying together the legs of a "cloven-hoofed animal" weighing under 250 pounds and then transporting that animal in such a manner for up to a half-hour. *Id.* § 343.24(2)(a).

37.    The Anti-Cruelty Law does not contain any other exemption or exception for farm animals. Notably, it does not contain an exemption for

13

"common" or "normal" industry practices and, even if it did, the conduct alleged herein is so egregious that it would violate such industry practices.

### C. The Minnesota Anti-Garbage Feeding Law

38.     In Minnesota, "[n]o person shall feed garbage to livestock or poultry without first securing a license from the [Minnesota Board of Animal Health]." Minn. Stat. Ann. § 35.75(1).

39.     Holden does not have a Minnesota State Board of Health permit to feed garbage to its pigs.

40.     Furthermore, Section 35.76 provides: "No person may feed garbage to livestock [ ] until it has been thoroughly heated to at least 212 degrees Fahrenheit for a continuous period of at least 30 minutes unless it is treated in some other manner which is approved in writing by the [Minnesota Board of Animal Health] as being equally effective for the protection of public health and the control of livestock diseases, and no person may knowingly permit livestock [ ] owned or controlled by that person to have access to any garbage which has not been heated or otherwise treated pursuant to this section." Minn. Stat. Ann. § 35.76; Minn. Rules, part 1721.0610 (distinguishing "Class A permits for feeding premises where garbage containing meat or refuse of any character that may have been in contact with meat may be fed to livestock") and part 1721.0650, Subpart 1 (Class A permit requirements); *see* Minn. Rules, part 1721.0600 "Exclusions."

41.     Minnesota law defines garbage to include "animal . . . refuse, including all waste material, by-products of a kitchen, restaurant, or slaughter house, and refuse accumulation of animal . . . matter, liquid or solid." Minn. Stat. Ann. § 35.73(4).

14

42.     Underscoring the critical importance of this law to public health, the administrative rules implementing the Minnesota Anti-Garbage Feeding Law strictly require that "Livestock that have been fed or allowed access to untreated garbage must be placed under quarantine by the board [and] may only be moved directly to a federally inspected slaughter establishment under permit from the board." Minn. Rules, part 1721.0660.

### D. The Federal Swine Health Protection Act

43.     The federal Swine Health Protection Act ("SHPA") says that "[n]o person shall feed or permit the feeding of garbage to swine except" in limited circumstances. 7 U.S.C. § 3803.

44.     "Garbage may be fed to swine only if treated to kill disease organisms, in accordance with [SHPA] regulations[,] at a facility holding a valid permit issued by the [United States Department of Agriculture ("USDA")], or the chief agricultural or animal health official of the State where located if such State has entered into an agreement with the Secretary pursuant to [SHPA] or has primary enforcement responsibility pursuant to [SHPA] . . . The Secretary may exempt any facility or premises from the requirements of this section whenever the Secretary determines that there would not be a risk to the swine industry in the United States." 7 U.S.C. § 3803(b).

45.     Federal SHPA regulations also provide that, "[n]o person shall feed or permit the feeding of garbage to swine unless the garbage is treated to kill disease organisms, pursuant to [federal SHPA regulations], at a facility operated by a person holding a valid license for the treatment of garbage; except that the treatment and license requirements

15

shall not apply to the feeding or the permitting of the feeding to swine of garbage only because the garbage consists of any of the following: Processed products; rendered products; [or other inapplicable types of garbage]." 9 C.F.R. § 166.2(a).

46.    The SHPA defines "'garbage'" as "all waste material derived in whole or in part from the meat of any animal [ ] or other animal material, and other refuse of any character whatsoever that has been associated with any such material, resulting from the handling, preparation, cooking, or consumption of food, except that such term shall not include waste from ordinary household operations which is fed directly to swine on the same premises where such household is located." 7 U.S.C. § 3802.

47.    As described by the USDA, the SHPA "allows each state to determine whether garbage feeding is allowed within their state" and, if so, [t]he state also develops the structure for enforcing the [SHPA] in their state"—which may be handled solely by state employees or in conjunction with employees of the USDA's Animal and Plant Health Inspection Service ("APHIS"). *Factsheet: What Swine Growers Need to Know about Garbage Feeding*, USDA APHIS (Nov. 2019) (available at https://www.aphis.usda.gov/publications/animal_health/fs-swine-producers-garbage-feeding.pdf) (last accessed June 28, 2023).

48.    The SHPA aims to protect human and animal health by ensuring that garbage fed to pigs is free of diseases. The SHPA requires that garbage containing animal meat or animal by-products must be heat-treated in a manner that is sufficient to kill disease-causing bacteria, which generally means that such garbage must be heated throughout at boiling temperature (212° F or 100° C at sea level) for at least 30 minutes by a person who

holds a valid license or permit to treat garbage fed to animals. SHPA also includes requirements for safely storing treated and untreated food scraps.[2]

49.     Congress enacted the SHPA, and the USDA promulgated SHPA regulations, "to protect the commerce, health, and welfare of the people of the United States by ensuring that garbage fed to swine does not contain active disease organisms that pose a risk to domestic swine."[3]

50.     Compliance with the SHPA ensures that all garbage fed to pigs is properly treated to kill disease organisms. Raw meat, such as piglet intestines, may transmit numerous infectious or communicable diseases to pigs, including foreign animal diseases such as foot-and-mouth disease, African swine fever, and classical swine fever.[4] The USDA is so concerned about the spread of disease from untreated garbage that it prohibits "equipment or material associated with untreated garbage" from even coming into contact with a pig feeding area. 9 C.F.R. § 166.6.

51.     Holden's failure to obtain a permit for feeding "garbage" to its sows, and to properly treat the waste to kill disease organisms, represents a clear and present danger to

---

[2] Under the regulations, waste feeder operations must be licensed and regularly inspected by USDA Animal and Plant Health Inspection Service ("APHIS") inspectors. In addition to other safeguards, the licensing process requires that producers adequately cook the waste fed to pigs using methods designed to destroy foreign animal disease agents. Federal Register/Vol. 80, No. 205/Friday, October 23, 2015/Notices, at 64391 https://www.govinfo.gov/content/pkg/FR-2015-10-23/pdf/FR-2015-10-23.pdf (last accessed June 28, 2023).

[3] Swine Health Protection Act; Amendments to Garbage Feeding Regulations, 84 Fed. Reg. 64414-01.

[4] https://www.hpj.com/livestock/garbage-feeding-raises-disease-risk-in-swine/article_8ca18b23-f4ea-58e2-8b65-a1a31400cf0d.html  (last accessed June 28, 2023).

17

public health and animal health.

52.    Intentionally putting animals in contact with feces also poses a risk for animal health. Porcine epidemic diarrhea virus ("PEDV"), which kills piglets, is rampant in the U.S. pig breeding industry and is transmitted by contact with contaminated fecal matter.[5]

53.    The potential impact of Holden's practices does not remain localized to its Utica "farm," since all of its piglets are shipped to grow-out facilities where the animals grow towards their slaughter weight. Since the grow-out facilities are also cramped, industrialized, indoor pig factories, any diseases carried by Holden piglets are likely transmitted to other piglets at the grow-out facility. In short, Holden's practices put public health and animal health at risk, including by posing a threat to unsuspecting Americans who consume Holden's pork products.

54.    SHPA establishes both civil and criminal penalties for violations. Civil penalties include fines up to $10,000 for each violation. 7 U.S.C. § 3805(a). Criminally, a violator may be guilty of a misdemeanor punishable by a fine of up to $10,000 and/or imprisonment for not more than one year. 7 U.S.C. § 3805(a).

### E. The Paycheck Protection Program

55.    In March 2020, as the COVID-19 pandemic gripped the United States and

_____

[5] Julie Larson Bricher, *Multi-model approach could help with PEDV outbreaks*, Meatingplace (Feb. 16, 2021), https://www.meatingplace.com/Industry/News/Details/97360 (cached version available here: https://webcache.googleusercontent.com/search?q=cache:sBJFNTF-qbEJ:https://www.meatingplace.com/Industry/News/Details/97360+&cd=1&hl=en&ct=clnk&gl=us) (last accessed September 17, 2021).

18

threw the U.S. economy—and the world—into tumult, Congress passed, and the President signed, the CARES Act. Among the many provisions in the CARES Act's $2 trillion stimulus package was the Paycheck Protection Program ("PPP").

56.    Under the PPP, the federal government, acting through SBA, not only fully guaranteed relief loans for eligible small businesses, individuals, and nonprofit organizations, but it was legally obligated to forgive the loan if the proceeds were used as required. Specifically, law-abiding businesses could use the PPP loans to pay for certain eligible expenses, including business costs, payroll costs, employee benefits and leave, mortgage interest payments, debt refinancing, rent, and utilities.

57.    Like other SBA loans, PPP loans are initially funded by authorized private lenders, with repayment guaranteed by the SBA in order to make the loans easily saleable on the secondary market.

58.    In order to encourage lenders to make these loans, and to do so quickly, the SBA gave lenders delegated authority to issue the loans based solely on the borrower's certifications and imposed on the lenders only minimal document review requirements. 85 Fed. Reg. 20811-01, Part III.3.a.iv. and b.

59.    The SBA paid lenders an origination fee for First Draw PPP loans made before December 27, 2020, as follows:

    a.  5% for loans of more than $50,000 and not more than $350,000;

    b.  3% for loans of more than $350,000 and not more than $2,000,000; and

c.  1% for loans of at least $2,000,000.[6]

In the present case, the SBA would have paid an origination fee of $25,700 on Holden Farms' $2.57 million PPP loan, which was originated in about April or May of 2020.

60.    As part of the underwriting process, PPP loan applicants certified in writing that: "the information provided in all supporting documents and forms is true and accurate." Applicants were required to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571, by imprisonment of not more than five years and/or a fine of up to $250,000; [and] under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000."

61.    Relevant here, the SBA required all PPP loan applicants to certify in good faith that: "The Applicant is not engaged in any activity that is illegal under federal, state or local law."

62.    Significantly, the federal government considers the borrower's certification that it is not engaged in unlawful conduct to be material to its Congressional authority to guarantee and forgive a PPP loan. This is evidenced by the fact that the Department of Justice ("DOJ") has brought enforcement actions against PPP borrowers who were in violation of laws governing their industry, thereby rendering false the express certification

---

[6] 85 FR 20811, 20816 Part III.2.d.; *see SBA Procedural Notice 5000-20091* (eff. Feb. 8, 2021) (available at: https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20091%20-%202nd%20Updated%20PPP%20Processing%20Fee%20and%201502%20Reporting-508.pdf) (last accessed June 28, 2023).

in their PPP loan application that they were "not engaged in any activity that is illegal under federal, state or local law."

63.     For example, the DOJ obtained a conviction for bank fraud against a PPP borrower who failed to disclose that he had billed government health care programs for services never rendered, for services that were not medically necessary, and for services that were tainted by violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) (criminal) 42 U.S.C. § 1320a-7a(a)(7) (civil).[7] The DOJ also intervened and settled a group of four *qui tam* FCA cases alleging, in part, that a medical provider PPP borrower falsely certified it was "not in violation of any laws," when in fact, it had been submitting claims to government health programs for services that were not medically reasonable and necessary, and/or were tainted by violations of the Stark Law.[8] Similarly, Holden was engaged in egregious violations of the law that are directly related to its main business, *viz.* raising pigs for slaughter.

---

[7] *South Florida Addiction Treatment Facility Operators Convicted in $112 Million Addiction Treatment Fraud Scheme* (DOJ Press Release Nov. 4, 2021) (available at https://www.justice.gov/opa/pr/south-florida-addiction-treatment-facility-operators-convicted-112-million-addiction) (last accessed June 28, 2023); *Addiction Treatment Facility Operators Sentenced in $112 Million Addiction Treatment Fraud Scheme* (DOJ Press Release March 21, 2022) )available at https://www.justice.gov/opa/pr/addiction-treatment-facility-operators-sentenced-112-million-addiction-treatment-fraud-scheme) (last accessed June 28, 2023).

[8] Physician Partners of America to Pay $24.5 Million to Settle Allegations of Unnecessary Testing, Improper Remuneration to Physicians and a False Statement in Connection with COVID-19 Relief Funds (DOJ Press Release April 12, 2022) (available at https://www.justice.gov/opa/pr/physician-partners-america-pay-245-million-settle-allegations-unnecessary-testing-improper#:~:text=Abraham%20Rivera%2C%20have%20agreed%20to,connection%20with%20a%20loan%20obtained) (last accessed June 28, 2023).

### F. The PPP Loan Forgiveness Process

64.     Law-abiding borrowers may be eligible for PPP loan forgiveness if the funds were used for eligible payroll costs, payments on business mortgage interest payments, rent, or utilities during either the 8- or 24-week period after disbursement. A borrower can apply for forgiveness once it has used all loan proceeds for which the borrower is requesting forgiveness any time up to the maturity date of the loan.[9] If borrowers do not apply for forgiveness within ten months after the last day of the covered period, then PPP loan payments are no longer deferred, and borrowers will begin making loan payments to their PPP lender.

65.     Specifically, "[a]n eligible [PPP loan] recipient shall be eligible for forgiveness of indebtedness on a covered loan," to the extent that 60% of the forgiven loan amount was used for payroll, and the remainder of the forgiven amount was used for other eligible expenses. 15 U.S.C. § 9005; Paycheck Protection Program—Revisions to First Interim Final Rule, 85 Fed. Reg. 36308, 26310-11 Part III.d. (published June 16, 2020) (revising 85 Fed. Reg. 20811, 20813-14 Part III.2.o. (Apr. 15, 2020)) (retrospectively eff.

---

[9] Loans issued prior to June 5, 2020, including the $2.57 million loan to Holden, have a maturity date of 2 years. For Holden, that means a maturity date of April 10, 2022, unless Holden and Compeer availed themselves of the flexibility afforded by later legislation allowing the borrower and lender to agree to a 5-year maturity date. *See* Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142 (June 5, 2020) ("Flexibility Act"), and the SBA's ensuing Revisions to First Interim Final Rule. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to First Interim Final Rule, 85 Fed. Reg. 36308, 36309 Part III.b. (June 16, 2020) (various effective dates).

Mar. 27, 2020).[10]

66.     A PPP loan recipient can apply for loan forgiveness using a prescribed SBA application form. The loan forgiveness application requires the applicant to certify, "I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges."[11]

67.     Upon approval by both the lender and the SBA of the borrower's loan forgiveness application, the federal government will pay the private lender back: "Not later than 90 days after the date on which the amount of forgiveness under this section is determined, the Administrator shall remit to the lender an amount equal to the amount of forgiveness, plus any interest." 15 U.S.C. § 9005(c)(3).

## V.    SUBSTANTIVE ALLEGATIONS

### A. The U.S. Pig Industry and Holden's Business Operations

68.     The modern pig production industry in the United States is characterized by a three-tier system of large corporate meatpackers, which purchase huge quantities of finished hogs from "integrators," often under a pricing formula. These integrators wholly own and/or put under contract a collection of smaller farming operations that breed and/or grow the hogs. Under this system, small family-owned hog operations either went out of business or were transformed into large, indoor facilities specialized in a particular phase

---

[10] If borrowers do not apply for forgiveness within 10 months after the last day of the covered period, then PPP loan payments are no longer deferred, and borrowers will begin making loan payments to their PPP lender.

[11] *See* https://home.treasury.gov/system/files/136/3245-0407-SBA-Form-3508-PPP-Forgiveness-Application.pdf (last accessed June 28, 2023).

23

of the breeding and growing process. The bottom-tier contract farmers do not own the hogs, but rather provide the land, buildings, and services to breed and/or raise the hogs at the direction of the integrator. Thus, under this system, the integrator typically owns the hogs and exerts considerable control over the facilities' daily operations, including the delivery of feed and veterinary services.[12]

69.    Holden is an integrator, and its business model includes farms/facilities that are wholly owned and operated by Holden, as well as private farms/facilities that are under contract with Holden. Most, if not all, of these facilities are large-scale industrialized operations, which are known in the industry as concentrated agricultural feeding operations ("CAFOs"). Hence, a company such as Holden is often referred to as a CAFO Integrator.

70.    According to a trade publication, Holden was the 16th largest pork producer in the United States in 2020, with a herd of 70,000 sows.[13] Holden is reported to generate approximately $8.3 million in annual sales[14] with 76 employees in its various locations,

---

[12] *See generally*, *Food and Power: Addressing Monopolization in America's Food System*, at 4-5 and nn. C. Kelloway and S. Miller (Open Markets Institute, Mar. 2019) (available at https://static1.squarespace.com/static/5e449c8c3ef68d752f3e70dc/t/614a2ebebf7d510deb fd53f3/1632251583273/200921_MonopolyFoodReport_endnote_v3.pdf); *U.S. Hog Market Contract Study (Dept. of Agricultural Economics Working Paper No. AEWP 2009-1)*, G. Grimes and R. Plain (Univ. of Missouri, Jan. 2009) (available at https://mospace.umsystem.edu/xmlui/bitstream/handle/10355/8942/USHogMarketingCon tractStudy.pdf?seque); *Langdon v. Holden Farms, Inc.*, Complaint and Exhibit ___ (MN Wean to Finish Independent Contractor Agreement), Case No. CV-14-2123 (MN Dist. Ct. for Rice County).

[13] *Successful Farming*, PORK POWERHOUSES 2020, https://www.agriculture.com/pdf/pork-powerhouses-2020 (last accessed June 28, 2023).

[14] https://www.dnb.com/business-directory/company-profiles.holden_farms_inc.3b58e7137b93bb4dc585b560823cadf9.html (last accessed June 28, 2023).

including its main facility located in Northfield, Minnesota.

71.    The animal cruelty and garbage-feeding conduct alleged herein pertains to Holden's wholly owned and operated facility located at 24161 County Road 115, Utica, Minnesota.

72.    Despite its size, Holden touts itself as being family-owned and operated since its founding in 1876.[15] Since 1991, Holden Farms, Inc. has been solely owned by brothers Kent and Barry Holden, who are the fourth generation to own and run the business. According to its most recent filings with the Minnesota Secretary of State, Holden's Chief Executive Officer is Barry W. Holden.[16] According to 2017 industry publications, the business is transitioning into the hands of Kent's three sons and Barry's two sons as follows: Kent's son Nick (40) oversees sow farms; Kent's son Nate (37) oversees hog marketing, feed, and new construction; Kent's son Tyler (35) oversees nursery and finishing; Barry's son Blake (36) oversees turkey operation and financials; and Barry's son Kyle (31) oversees maintenance and logistics.[17]

73.    Consistent with the foregoing, Holden's website lists its "leadership team" as follows: Blake Holden, President; Nate Holden, Vice President Feed and Sales; Tyler

---

[15] https://holdenfarms.com/about/history/ (last accessed June 28, 2023).

[16] https://mblsportal.sos.state.mn.us/Business/SearchDetails?filingGuid=0ccb9fb9-b9d4-e011-a886-001ec94ffe7f (last accessed June 28, 2023).

[17] *SF Special: How Holden Farms Successfully Brought Five Family Members Into The Business*, Betsy Freese (Successful Farming, August 15, 2017) (available at https://www.agriculture.com/livestock/hogs/how-holden-farms-successfully-brought-five-family-members-into-its-growing-business) (last accessed June 28, 2023); *All in the Family—Holden Farms Has Room to Grow*, Joann Lumbaugh (Farm Journal's Pork, Dec. 1, 2017) (available at https://www.porkbusiness.com/news/hog-production/all-family-holden-farms-has-room-grow) (last accessed June 28, 2023).

Holden, Vice President Hog Operations; Kyle Holden, Vice President Business Operations and Secretary.[18]

74.     Significantly, the Holden family leadership team attributes its success to openly communicating with each other about all aspects of the business, and working to resolve any disagreements about particular business practices or decisions.[19] Nick, the first of his generation to join the business, said, "Look around the room—I really enjoy working in a family business. The challenges that come with it are worth it. We've been able to address issues as they occur and work through them."[20]

75.     The transition to the fifth generation has been marked by regular meetings. As recounted in one industry publication: "Short meetings take place every Monday afternoon, and whomever is there will review for the group what has happened the prior week and make plans for the current week. Members of the younger generation have their own meetings to discuss important issues and determine what needs to be done. Quarterly board meetings are held, too, with everyone present."[21]

---

[18] https://holdenfarms.com/about/team/ (last accessed June 28, 2023).

[19] *See*, *Communication Keeps Holden Farms A Family*, Sara Brown (Farm Journal's 'Pork', Dec. 2, 2017) (available at https://www.porkbusiness.com/news/hog-production/communication-keeps-holden-farms-family#:~:text=It%E2%80%99s%20obvious%20the%20five%20members%20of%20the%20fifth,fifth%20generation%20consider%20their%20part%20in%20Holden%20Farms.) (last accessed June 28, 2023).

[20] *Holden Makes Family the First Priority*, Sara Brown (Farm Journal's 'Pork', Dec. 1, 2017) (available at https://www.porkbusiness.com/news/hog-production/holden-makes-family-first-priority) (last accessed June 28, 2023).

[21] *Holden Farms: Secure Transfer to the Fifth Generation*, Sara Brown (Farm Journal's 'Pork', Dec. 1, 2017) (available at https://www.porkbusiness.com/news/hog-production/holden-farms-secure-transfer-fifth-generation) (last accessed June 28, 2023).

76. The family-owned nature of Holden, however, does not mean it is unsophisticated. For example, during previous litigation, Holden leadership has testified that it keeps careful records for both wholly owned and contract facilities tracking "average weight," "death loss, feed conversion, ... vaccination costs" and "anything like that."[22] Indicative of the centralized nature of Holden's control over its facilities, these records are kept at Holden's corporate offices.[23]

77. The sophistication of Holden's operations is also reflected by the fact that its facilities have been the location of several industry research projects, and the authors have often included Holden employees—including its veterinarian.[24]

78. Importantly, one of the studies conducted at a Holden facility notes that it was performed in accordance with the guidelines of Pork Quality Assurance Plus® and

---

[22] *Holden Farms, Inc. v. Hog Slats*, No. 00-cv-785-DSD-SRN (D. Minn.), ECF ___ (2001 Deposition of Barry Holden at 80:12-25; 83:22-85:21); *Id.* ECF ___ (2001 Deposition of Kent Holden at 101:23-105:16; 113:15-117:13; 119:3-7) (describing the methodology by which Holden calculated the financial cost of "feed conversion").

[23] *Id.*, ECF ___ (2001 Deposition of George Kaspar, a Holden plant supervisor, at 38:17-39:7).

[24] *See, e.g.*, *Monitoring gilt performance and retention as inputs to overall sow productivity*, Neil DeBuse, DVM, Holden Farms, Inc. (paper presented at the 2006 Allen D. Leman Swine Conference) (available at https://conservancy.umn.edu/handle/11299/142048) (last accessed June 28, 2023); *Larger hogs require rethinking space allowance, marketing strategy*, Annie B. Lerner, Matt W. Allerson, Holden Farms, et al. (National Hog Farmer, Jan. 10, 2019) (available at https://www.nationalhogfarmer.com/livestock-facilities/larger-hogs-require-rethinking-space-allowance-marketing-strategy) (last accessed June 28, 2023) ("The experiment was conducted at a commercial finishing barn in Minnesota"); *Outcomes of low birth weight phenotype on piglet gut microbial compositions and intestinal transcriptomic profile*, Janelle M. Fouhse, et al. (Can. J. Animal Science, Aug. 15, 2019) ("study performed on a commercial multiplier farm (n = 2,400 sows, Holden Farms, inc.) located near Northfield, Minnesota, USA") (available at https://cdnsciencepub.com/doi/10.1139/cjas-2019-0066) (last accessed June 28, 2023).

27

Holden Farms, Inc. ethical guidelines.[25] The fact that Holden has its own "ethical guidelines" underscores that Holden is aware of the laws governing its operations, including laws prohibiting the cruelty of animals and garbage-feeding.

79.    Moreover, at least one member of the fifth-generation leadership team, Nick Holden, has authored or co-authored research articles concerning sow breeding practices,[26] such as those conducted at Holden's Utica, Minnesota facility implicated by the allegations herein.

### B. The Undercover Investigation

80.    Relator turns now to the undercover investigation at Holden's wholly owned and operated Utica, Minnesota sow breeding facility, which, at all times relevant to the conduct alleged herein, was under the control of Nick Holden.[27]

81.    Immediately beneath Nick were two men with the first names Aaron and Landon, both with the title "Supervisor." Landon lived in Iowa and Aaron lived in Whitewater, Minnesota. Aaron and Landon each oversaw the operation of several Holden

---

[25] *Outcomes of low birth weight phenotype on piglet gut microbial compositions and intestinal transcriptomic profile*, Janelle M. Fouhse, et al. (Can. J. Animal Science, Aug. 15, 2019) ("study performed on a commercial multiplier farm (n = 2,400 sows, Holden Farms, inc.) located near Northfield, Minnesota, USA") (available at https://cdnsciencepub.com/doi/10.1139/cjas-2019-0066) (last accessed June 28, 2023).

[26] See, e.g., The impact of gestation feeding on sow performance, Nick Holden, Holden Farms, Northfield, MN (presented at the 2005 Allen D. Leman Swine Conference); Commercial Application of reducing semen concentration per dose and single sire evaluation, A. Williams, N. Holden, et al. (paper presented at the 2011 Allen D. Leman Swine Conference) (available at https://conservancy.umn.edu/handle/11299/140845) (last accessed June 28, 2023).

[27] *See* https://www.agriculture.com/livestock/hogs/how-holden-farms-successfully-brought-five-family-members-into-its-growing-business (last accessed June 28, 2023).

facilities.

82.    Immediately below the position of "Supervisor" was a role with the title of facility "Manager." Immediately below "Manager" was a role with the title "Assistant Manager."

83.    At the beginning of the time period of the undercover investigation (*i.e.*, about November, 2019), a man with the first name Jamie was the manager of the Utica facility, and a woman with the first name Karen was the facility's assistant manager. While the investigation was ongoing (*i.e.*, through at least March, 2020), Jamie was forced to transfer to another facility and Karen quit, leaving the Utica facility without a manager or assistant manager. Aaron initially filled in as the facility manager while continuing his role as supervisor. Landon then replaced Aaron, acting as the Utica manager alongside his role as supervisor.

84.    Against backdrop pictures of cute and happy piglets,



(Screen capture taken June 15, 2023, from https://holdenfarms.com/)

Holden falsely promises on its website that it is "committed to responsible family farming." Holden claims, as one of its five commitments, to be "[c]ontinuing our legacy of leadership

in the adoption of our industry's best practices for animal welfare, environmental stewardship and safe food production."[28]

85.    Holden claims and advertises to adhere to the pork industry's We Care[29] responsible pork initiative.[30]

86.    We Care includes the following "ethical principles":

- Food Safety: Commitment to using management practices that are consistent with food safety; managing the health of herds; and using technologies that minimize food safety threats;[31]

- Animal Well-being: Commitment to providing feed, water and an environment that promotes well-being providing proper care, handling and transportation at each stage of life; protecting pig health and providing appropriate treatment, including veterinary care, when needed[; and u]sing approved practices to euthanize, in a timely manner, sick or injured pigs that fail to respond to care and treatment;[32] and

- Public Health: Commitment to making use of practices consistent with producing safe food; carefully managing the use of animal health products; and managing manure and air quality.[33]

---

[28] https://holdenfarms.com/about/commitments/  (last accessed June 28, 2023).

[29] https://www.porkcares.org/ethical-principles/public-health  (last accessed June 28, 2023).

[30] https://holdenfarms.com/approach/welfare/  (last accessed June 28, 2023).

[31] https://www.porkcares.org/ethical-principles/food-safety/  (last accessed June 28, 2023).

[32] https://www.porkcares.org/ethical-principles/animal-well-being/  (last accessed June 28, 2023).

[33] https://www.porkcares.org/ethical-principles/public-health/  (last accessed June 28, 2023).

30

87.     As the allegations contained herein establish, as to Holden's self-proclaimed best practices, nothing could be further from the truth.

88.     From November 4, 2019, to March 5, 2020, an undercover investigator sent on Relator's behalf worked as a farrowing technician at a pig breeding facility owned and run by Holden, located at 24161 County Road 115, Utica, Minnesota 55979. The undercover investigator collected five hours of video and documented over 100 incidents of cruelty, neglect, and the feeding of feces and dead piglets to mother pigs.

89.     At the Utica facility, Holden artificially inseminates sows, keeps the sows in cramped farrowing crates, and sends the piglets first to so-called nurseries, then to grow-out facilities, and eventually to slaughter.

90.     The investigator-employee documented pervasive, intentional abuse; severe neglect of the sows and their piglets; and illegal feeding of untreated "garbage" to sows without proper licensure and supervision. These practices—which Holden's managers and supervisors engaged in with full awareness and participation—violate federal and state laws designed to protect against animal cruelty and threats to public health.

91.     On April 10, 2020, Holden applied for and obtained a $2.57 million PPP loan from Compeer. Holden's certification that it "is not engaged in any activity under federal, state or local law" was material and germane to the government's decisions to guarantee the loan, to pay Compeer origination fees of $25,700, and to later forgive the loan and pay Compeer the full balance owing on the $2.57 million PPP loan.

92.     In November, 2020, Holden applied for forgiveness of the loan, which forgiveness it received on June 17, 2021. Holden's certification acknowledging that "if the

31

funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges" was material and germane to the government's decision to forgive Holden's loan and pay back Compeer.

93.    Holden's inhumane and unethical treatment of sows and their piglets violates Minnesota's strong anti-cruelty laws and the federal swine health law.

94.    Holden's inhumane neglect of care for the sows and their piglets also creates conditions rife for disease and threatens serious risk to both animal and public health.

95.    Holden's illegal garbage-feeding, and the resultant risk of contamination to its pork products entering the marketplace for human consumption, also poses a grave public health threat. Relator's evidence of Holden's employees feeding a cocktail of feces and piglet intestines to its sows without the requisite testing of the "feedback materials" confirms Holden's violation of the SHPA and the Minnesota Anti-Garbage Feeding Law. This unlawful feeding of garbage to pigs also poses a risk to animal health—including endangering other pigs beyond those kept at the Holden facility. And it poses a health risk to people who interact with the animals at the Holden facility.

### 1. Holden Neglects and Abuses its Sows and Piglets in Violation of the Minnesota Anti-Cruelty Act.

96.    The investigation revealed that Holden employees engage in unconscionable abuse and neglect of its pigs. The video documents numerous incidents of employees excessively beating mother sows, sadistically abusing piglets, depriving mother sows of food and nutrition, improperly and cruelly castrating male piglets, and improperly and cruelly euthanizing sows and piglets. These appalling acts of inhumane treatment violate

32

Minnesota's anti-cruelty law.

97.   Holden's conduct makes a mockery of its claimed commitment to "[p]roviding feed, water and an environment that promotes well-being[; p]roviding proper care[ and] handling at each stage of life;" and "protecting pig health."

98.   Holden's conduct rendered false its certification that it was not engaged in any activity that is illegal under federal or state laws when it applied for, received, and ultimately obtained forgiveness of, a $2.57 million PPP loan.

### a. Holden Starves Mother Pigs and Keeps Them and Their Piglets in Deplorable Breeding Conditions

99.   Holden repeatedly deprives its mother pigs of food. A Holden Farms employee stated, on video, that the facility manager routinely fails to order enough feed for all the pigs. If the manager ordered more food than the pigs would eat, the company would fine the Utica facility. As a result, to avoid the risk of over-ordering, the manager would order at least one unit less than the pigs' anticipated need, and approximately every weekend, some or all of the sows kept at Holden were forced go the whole weekend without eating. The worker in the video clip expressed that he raised the issue with the manager but "that apparently didn't do anything."

100.   Landon was aware that the sows regularly did not receive enough food to eat during the weekend.

101.   Pigs like those kept at Holden have been bred to grow fast thus requiring a large amount of feed. Moreover, pigs are acutely sensitive to food deprivation and become extremely distressed when not fed adequately. As a result, to be forced to go without food

33

is one of the most extreme forms of suffering for pigs—especially a pregnant or nursing mother whose body is diverting nutrition to her young. As documented on the video, pigs deprived of adequate food by Holden emitted deafening screams, bit the bars of their crates, and appeared intensely agitated.

102.   Holden forces mother pigs to live in tiny cages, called "farrowing crates." In these body-gripping crates, mother pigs are immobilized lying on their sides, separated by metal bars from their piglets, who live and nurse in the adjacent part of the crate. The crates are so small that the mother pig cannot turn around or even stand up comfortably. The mother pigs sometimes become trapped in the cramped metal bars.

103.   Holden repeatedly impregnates pigs, so that they go through a constant cycle of pregnancy, birth, and nursing, until they are slaughtered.[34] The mother pigs at Holden are thus immobilized in the crates for a significant portion of their lives. The ostensible purpose of a farrowing crate is to prevent the mother sow from rolling over and crushing her piglets in the confined space.[35] Yet, as detailed below, Holden routinely neglects piglets and allows a significant portion of them to die in the crates, making the extreme confinement of the mother pigs not only cruel but entirely unnecessary.

104.   The mother pigs' bodies rub against the metal crate walls, causing painful sores. One sow was documented with a sore that had turned into a large abscess.

---

[34] If repeatedly impregnated, a sow will have, on average, 2.5 litters per year, for two to three years. This means that a sow kept at Holden will spend a large portion of her lifetime in extreme confinement.

[35] *See, e.g.*, https://www.hogslat.com/sow-farrowing-crates (farrowing crate product discussing anti-crush characteristics) (last accessed June 28, 2023).

### b. Documented Incidents of Animal Cruelty

105.   Holden employees repeatedly subject the sows and their piglets to violent attacks of kicking and beatings for no apparent reason. In one recorded incident, workers pushed and kicked a "downed" sow—one too sick or injured to stand and walk. One worker joked that this was a good leg workout and speculated that the pig's paralysis stemmed from continuously laying on her leg. Evidently, the farrowing crate was so small that the pig was forced to lay in one position for so long that she was unable to walk afterwards.

106.   In another incident, a worker hit a sow with a metal gate rod, even though the sow was already moving in the direction the worker wanted. In yet another incident, a worker continued to kick a pig who was already suffering from an abscess on her foot, even after she had fallen to the ground and was struggling to walk.

107.   In multiple incidents, workers were documented lifting a "rattle paddle"—a tool meant for sorting and encouraging pigs to move—over their heads to beat the pigs.

108.   In another example of cruelty, when a sow became stuck on the side of a farrowing crate, a worker tried to pull her out by her ear. The investigator offered to remove the four bolts on the wall to let the sow walk out on her own. Instead, the first worker scraped a sharp steel rod against the sow's skin, causing her to bleed profusely.

109.   Holden workers would act violently and cruelly toward the pigs in front of both Aaron and Landon.

### c. Neglect and Lack of Treatment Cause Illness and Injury

110.   Pigs would regularly sustain injuries at the Holden breeding facility, including tears in their ears and vulvas, and sores from living in such tight cages. Even

35

though these injuries were common, only two workers were ever seen treating them, with one at the behest of the investigator.

111.   Several documented animals were lame—they could not walk correctly, due to overgrown hooves, getting legs stuck in equipment, or other unknown ailments. Several sows suffered from retained piglets, where the mother has difficulty birthing her young. This often resulted in piglets dying before birth.

112.   Many piglets were documented in poor condition—trembling, twitching their legs, or covered in excrement. Sick and injured piglets were not removed and isolated for monitoring and treatment, which would enable them to recover. Instead, Holden left them in the farrowing crates with their littermates, allowing them to easily transmit diseases.

113.   The video also captures numerous instances where live piglets have fallen through the holes of the farrowing crates, into a pit filled with feces, urine, and piglet corpses. Rather than disposing of the waste and removing the struggling animals, the piglets are left in the pit to die and decay.

114.   In addition, numerous sows were documented with severe prolapses. The pig's uterine tissue would dry up and become infected and necrotic, allowing her intestines to spill out of her body. In one documented incident, a pig's grossly distended prolapsed tissue swung side to side as she walked down a hallway.

115.   Although a veterinarian can easily treat a prolapse and bring the sow back to health, Holden pigs' prolapses were left untreated by a veterinarian, resulting in the preventable deaths of numerous sows. In fact, the only time the investigator saw a

36

veterinarian visit in four months of working at the Utica facility was when the veterinarian came to sell the farm pig semen and instruct them on the best way to inject it into the sows to increase piglet yield. Despite the high pig mortality rate and the chronic, painful injuries and health conditions the sows and piglets were suffering, the investigator did not see any veterinarian examine the condition of the piglets and sows at all.

116.   The investigator documented piglets trying to nurse from their dead mother, who had suffered a severe prolapse that spilled out of her farrowing crate.

117.   In another incident documented in the video, a mother pig had become stuck between the bars of a farrowing crate and eventually died, unable to escape. Workers had to saw her body into pieces to pull her out of it. As they did so, they discussed the fact that the pig had been alive the previous day and that Jamie was aware she was stuck, but neither he nor anyone else had done anything about it. A worker then confirmed that management ignored similar incidents in the past.

118.   Death from untreated prolapse or becoming stuck in a farrowing crate are just a few of several examples of inadequate or absent treatment and veterinary care at the breeding facility. In addition, workers appeared to provide pigs prescription drugs without veterinary oversight and for nonsensical purposes.

119.   For example, the investigator documented workers proposing to use the prescription drug oxytocin in response to a thin sow who was not eating. This is not an accepted use of oxytocin for swine as the drug is instead used to bring in milk or to decrease farrowing time by stimulating contractions for the birthing of piglets toward the end of a

37

litter.[36] In other words, while oxytocin may help piglets gain weight because it can bring in their mother's milk, it is not used to improve a sow's appetite.

120.  As another example, one employee, a former Utica manager who had no veterinary training, regularly experimented with veterinary drugs to try to treat the sows' abysmal health conditions, commonly using the anti-inflammatory drug Dexamethasone ("Dex") for various ailments. Jamie would regularly order such drugs from Holden's headquarters office, for delivery with their weekly supplies.

121.  These are just a few examples of inadequate or the lack of even minimal veterinary care at the breeding facility. The video reveals many more.

122.  The untreated prolapses and other injuries and ailments were so commonplace that Nick Holden, Aaron, and Landon were all aware of them.

### d.  High Mortality Rates

123.  The investigator documented a high mortality rate on the farm. In one month (November 2019), the investigator removed approximately 729 dead piglets from the farrowing rooms. One manager once estimated that 39% of piglets born on the farm were dying—an extreme mortality rate far beyond what is common in the pig breeding

---

[36] *See* S.K. Linnen, J.M. Benz, S.S. Dritz, J.M. DeRouchey, R.D. Goodband and M.D. Tokach, *Be Careful with Oxytocin Use in Sows* (Apr. 1, 2009) (available at https://www.thepigsite.com/articles/be-careful-with-oxytocin-use-in-sows) (last accessed June 28, 2023); C. Robert Dove, *Farrowing and Lactation in the Sow and Gilt*, at 2 (Univ. of Georgia Cooperative Extension, Bulletin 872, Rev. Sept. 2009) (available at https://athenaeum.libs.uga.edu/bitstream/handle/10724/12025/B872.pdf?sequence=1&isAllowed=y) (last accessed June 28, 2023).

industry.[37]

124.    The investigator documented dead pigs and piglets piled up inside of the compost room, which was used as a disposal area for dead animals, and in bins outside the compost room. Even more appalling, dead piglets were left all over the facility, whether in their farrowing crates or in hallways, decaying and desiccating into husks.

125.    Indeed, even after the "cleaning" of a weaning room by pressure-washing, dead piglets and placenta would clog the floor and muck would coat the walls. The filth was so pervasive that when the investigator pushed his cart of supplies through the rooms, the cart would get stuck on the dead piglets and placenta and even tip over.

126.    Piglets were frequently born dead or died shortly after birth. One clip from the video features a cart full of dead piglets pulled from crates by an employee.

127.    Nick Holden was aware of the extremely high mortality rate at the Utica facility.

## 2. Holden Employees Torment and Torture Piglets.

128.    Listening to the audio of the undercover video, one cannot escape the pervasive sound of piglets screaming. Workers wear ear plugs, presumably to block out

---

[37] According to a 1993 U.S. Department of Agriculture survey, the overall average for preweaning mortality was 15.03%. *See* R. Tubbs et al., Preweaning morbidity and mortality in the United States swine herd at 5 & Table 3, *available at* https://www.aasv.org/shap/issues/v1n1/v1n1p21.pdf (last accessed June 28, 2023). This is consistent with a 2021 study finding the average piglet mortality rate in the pig production industry in Spain over the past ten years has been between 11.9 and 14.4 percent. *See* Y. Koketsu et al., *available at* https://porcinehealthmanagement.biomedcentral.com/articles/10.1186/s40813-020-00182-y (last accessed June 28, 2023).

this sound; the piglets' screaming induces stress in all of the animals who hear it, including the mother pigs.

129.  Holden workers apparently torment piglets for pleasure to entertain or impress their co-workers. For example, undercover video shows one worker shaking, stretching, spinning, squeezing, hitting another worker in the face with, and pretending to throw a terrified piglet for over eight continuous minutes, all the while casually speaking with his co-workers. Eventually, a second worker pokes the piglet, causing the exhausted animal to let out a faint squeal. In response, three workers laugh.

130.  In a second documented incident, a worker picks up a piglet holding him or her by the legs, while the piglet screams and struggles to get away. The worker smiles as the piglet dangles.

131.  And in a third documented incident, a worker uses a live piglet to play a game of catch with his colleague. The worker throws the piglet with such force that when the animal hits a PVC ceiling pipe, the pipe breaks. Water sprays everywhere and the piglet falls to the floor, unable to move.

### a. Holden's Barbaric Castration of Piglets

132.  In a gruesome display of abuse, Holden employees castrate piglets without the proper tools and without painkillers.

133.  In the pork industry, shortly after birth, piglets are often castrated and have their tails clipped, without anesthesia.[38] However, industry guidelines require, at a

---

[38] Castration is performed to reduce "boar taint," an odor some consumers detect in pork from intact male pigs.

minimum, the use of a sharp knife such as a scalpel. Alternatives to manual castration also exist, making the practice unnecessary.[39]

134.   Here, the investigator documented workers ripping the testicles out of screaming piglets with their hands, instead of using cutting tools designated for that purpose. The investigator documented multiple piglets who appeared to have died from internal injuries resulting from this crude practice. Two employees were documented throwing testicles at each other or at another employee off-camera. Workers had engaged in this exercise so frequently that the wall behind was covered in testes.

135.   The facility manager told employees that this practice of tearing testicles off by hand could cause ruptures inside the animals, which would require those animals to be euthanized. In the same breath, he then bragged that he had torn testicles off before, because he knew how to do it "properly."

136.   In another witnessed incident, one farrowing technician admitted to the investigator that he had bitten the tail off of a piglet during castration instead of using tools. This same worker also joked with another employee that biting tails off is considered "manly."

---

[39] Some farmers use a pharmaceutical alternative by which piglets can be immunologically castrated without having their bodies mutilated. *See* Dale Miller, "Understanding Improvest," *National Hog Farmer*, Jan. 15, 2013, available at: https://www.nationalhogfarmer.com/marketing/understanding-improvest (last accessed June 28, 2023); FSIS Directive 6100.8, Rev. 1, "INSTRUCTIONS FOR VERIFICATION OF IMMUNOLOGICALLY CASTRATED HOGS," U.S. Department of Agriculture Food Safety and Inspection Service, Jan. 14, 2021, available at: https://www.fsis.usda.gov/sites/default/files/media_file/2021-02/6100.8.pdf (last accessed June 28, 2023).

137.   Holden did not use topical antiseptic or iodine on the piglets after either castration or tail docking.[40] Workers thus placed piglets with open wounds onto floors laden with dead piglets, feces, and other bodily fluids, without any topical protection from bacteria or other pathogens.

**b. Delayed or Incomplete Euthanasia of Piglets to Save Money**

138.   On the occasions that Holden does bother to remove injured or failing piglets for euthanasia, workers typically euthanize them by gassing them with carbon monoxide. But Holden waits until the euthanasia box is full with what it deems to be *enough* sick piglets before running the machine. This means that sick piglets are left suffering while they wait. In addition, the facility sometimes performs the gassing improperly—or, in some instances, opts for a cruder, less humane method than gassing.

139.   The primary method of euthanizing piglets at the farm is to place the animals in a machine called a Euthanex AgPro. This machine is then filled with carbon dioxide ($CO_2$), which is intended to render the animals insensible and eventually kill them. The machine's effectiveness is dependent upon the concentration of gas in the chamber. Workers at the Holden facility sometimes used a low concentration of gas insufficient to kill the piglets. After the machine was run, piglets were documented still alive, shaking and struggling to breathe.

140.   In one witnessed event, the investigator was told that piglets are often left suffering throughout the day so they could all be euthanized at once, saving a few pennies

---

[40] Tail docking is the industry term for cutting piglet's tails.

or dollars on gas. In one videotaped incident, a worker said, of an injured piglet with a fracture about to be put in the Euthanex box, that it was "not worth running one" and that workers could wait until the following morning.

141.    Manual blunt force trauma, colloquially referred to as "thumping"—the crude practice of trying to "euthanize" piglets by swinging them from their back legs and bashing their heads against a concrete wall or floor—was sometimes used as an alternate method.

142.    For sows, workers used a captive bolt gun for euthanasia. In one documented incident, two employees conversed about the gun being stuck in a sow's head after it was used on her improperly.

### C. Defendant's Violation of SHPA and the Minnesota Anti-Garbage Feeding Law Creates Ongoing Risk to Public Health, Including to Consumers of Pork Products Derived from Holden's Pigs.

143.    Holden has exposed and continues to expose U.S. consumers of Holden pork products to the risk of contracting various "zoonotic" infectious diseases by feeding the remains of dead piglets and feces to the mother pigs. Specifically, Holden takes dead piglets (some long dead, as established by the videotaped incidents) and then mixes the pig feces with the organs of the dead piglets into a smoothie-like substance, and feeds it to the sows, via a process sometimes called "feedback,"[41]  which is so dangerous that, as

---

[41] So-called "Feedback" feeding (*i.e.*, feeding the bodies of dead pigs to living ones) carries a significant risk of transmitting infectious disease from the dead pigs to the living ones, especially when the pig corpses are mixed with feces, and is a response to a problem generated by Holden's intensive animal production process: Holden sows spend their whole lives in an indoor factory of metal bars and hard substrate floors. They have

43

described *infra*, animals subjected to untreated "feedback" feeding – as Holden pigs were – are required, by law, to be quarantined to prevent the spread of previously-undetected disease.

144.   The Utica facility workers prepared this feedback under direction from Holden company leadership.

145.   Holden does not hold a permit from, nor is it licensed by, the Minnesota Department of Health to feed garbage—here, feces and animal remains—to pigs.

146.   Holden does not test the feedback for dangerous pathogens, nor does it cook the feedback on high heat for at least 30-minutes, both as required by SHPA regulations (9 C.F.R. §§ 166.2 and 166.7) and the Minnesota Anti-Garbage Feeding Law (Minn. Stat. Ann. § 35.76). Rather, employees take the raw mixture and either immediately place some in the pens for sows to consume, or pour the mixture into plastic bags and place them into a freezer for later feeding to the sows as frozen blocks to lick.

147.   Undercover footage shows one employee dry-heaving while preparing the mixture. Another employee is recorded stating that animal activist groups would have a field day if they knew about the creation and use of the "feedback" process.

148.   There are significant health risks to Holden's "feedback" practices, as reflected by the Minnesota Anti-Garbage Feeding Law implementing regulation imposing that: "Livestock that have been fed or allowed access to untreated garbage must be placed under quarantine by the board [and] may only be moved directly to a federally inspected

---

no dirt in which to root around, and thus their immune systems are typically under-developed.

slaughter establishment under permit from the board." Minn. Rules, part 1721.0660. This is because feeding pigs feces and the remains of dead piglets perpetuates the disease cycle. Specifically, whatever diseases the dead piglets had can easily be transmitted to the pigs that eat the feedback.

149.    The public health consequences of Holden's failing to abide by the SHPA regulations and the Minnesota Anti-Garbage Feeding Law are substantial. Heat treatment and testing ensures that disease-causing bacteria is killed so that any waste fed to pigs does not contain active disease organisms that can be passed on to the public—including neighboring communities and consumers of the resulting pork products—and other pigs. Such risk includes contracting foodborne illness, infectious foreign animal diseases, or zoonotic disease (transmitted from animals to humans)—including African swine and classic swine fever.

### D.  Defendant Holden Farms, Inc. Knew that Its Conduct Violated a Material Term of Its PPP Loan

150.    Holden's violation of its material contractual obligations, specifically to abide by all federal and state regulations, is systematic and ongoing.

151.    Holden's violations were taking place in the view of, and with full awareness and approval of, the Utica facility Manager, as well as Holden's Supervisors and General Manager of Sow Operations. Holden's Manager, Supervisors, and General Manager of Sow Operations took part in, observed, approved, or had knowledge of, the violations articulated above.

152.    Holden's Utica facility held weekly all-staff meetings in the break room.

45

These meetings would occur when a supervisor (such as Aaron or Landon) or Nick Holden visited the facility. The meetings regularly discussed the facility's high rates of sick and dying piglets and sows. Holden's workers also regularly discussed the company's use of feedback at the meetings.

153.   Holden knew that these violations were occurring systematically at its facility.

154.   Holden knew that its ongoing and systematic violations rendered false its applications to the SBA for PPP relief and for loan forgiveness.

155.   Holden also knew that the reasonable consequence of its violations of the SHPA and its regulations was a grave risk to public health in consuming the resultant pork products.

156.   Holden's scheme violates the FCA and damages the United States.

## COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### (False or Fraudulent Claims)

157.   Relator realleges and incorporates by reference Paragraphs 1- 156 above.

158.   By virtue of the acts described above, Defendant knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval—specifically by submitting an application for a PPP loan containing the false express certification that it was in compliance with all federal, state, and local laws and by the false implied certification of such compliance through acceptance and retention of the loan proceeds and applying for loan forgiveness—in violation of 31 U.S.C. § 3729(a)(1)(A).

46

159.  The act of knowingly presenting or causing to present a materially false or fraudulent claim for payment or approval renders Defendant liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

160.  Each of the false or fraudulent claims Defendant submitted, or caused to be submitted, is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

161.  Furthermore, had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making the corresponding payments.

162.  The United States, however, was unaware of the false or fraudulent nature of the claims Defendant presented or caused to be presented.

163.  The false or fraudulent claims Defendant knowingly submitted or caused to be submitted to the United States were material to the United States' decisions to pay origination fees to Compeer, to guarantee the loan, and/or to forgive all or part of the loan.

164.  Because of the materially false or fraudulent claims Defendant presented, or caused to be presented, the United States paid the corresponding claims.

165.  As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendant is liable to pay treble actual damages pursuant to 31 U.S.C. § 3729(a).

### COUNT II
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### (False Records or Statements)

166.  Relator realleges and incorporates by reference Paragraphs 1- 156 above.

47

167.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval—specifically by submitting an application for a PPP loan containing the false express certification that it was in compliance with all federal, state, and local laws and by the false implied certification of such compliance through acceptance and retention of the loan proceeds and by applying for loan forgiveness—in violation of 31 U.S.C. § 3729(a)(1)(B).

168.    For purposes of obtaining or aiding to obtain payment or approval of a PPP loan guaranteed by the SBA, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements.

169.    Defendant's false certifications and representations were made for the purpose of ensuring that the United States guaranteed the loan and paid the false or fraudulent claims in connection with the loan, which was a reasonable and foreseeable consequence of Defendant's statements and actions.

170.    Each false record, certification, and/or application submitted to Compeer and/or the Government in support of Defendant's applications for PPP loan issuance and/or forgiveness, and which resulted in the above-described false or fraudulent claims submitted to the Government, is a separate false record or statement and a separate violation of 31 U.S.C. § 3729(a)(1)(B).

171.    The act of knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval renders Defendant liable for statutory penalties,

48

pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

172.   Had the United States actually known of the false or fraudulent nature of the records or statements, it would have been prohibited by law from making corresponding payments.

173.   The United States, however, was unaware of the false nature of the records or statements.

174.   Defendant knowingly made the false records or statements in connection with its applications for PPP loan issuance and/or forgiveness, and those false records or statements were material to the United States' decisions to guarantee the loan and to make payments in connection with that loan.

175.   Because of the falsity of the records or statements, which were material to false or fraudulent claims submitted for payment or approval, the United States has been damaged in an amount to be determined at trial.

176.   As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendant is liable to pay treble actual damages pursuant to 31 U.S.C. § 3729(a).

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of itself and the United States Government, respectfully prays as follows:

1.   That for violations of the FCA, this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States Government

has sustained because of Defendant's actions, plus the maximum civil penalties allowed by law for each and every action in violation of the FCA;

2.      That Relator be awarded the maximum relator's share of the treble damages, penalties, or other financial benefit awarded to the Government, pursuant to 31 U.S.C. § 3730(d);

3.      That the Court enter judgment against Defendant and for Relator in the full amount of Relator's reasonable costs and expenses of this action, including all reasonable attorneys' fees, pursuant to 31 U.S.C. § 3730(d); and

4.      That the United States Government and Relator receive all relief, both in law and equity, to which they reasonably are entitled.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Respectfully submitted by:

**NICHOLS KASTER, PLLP**

Dated: June 29, 2023

*/s/ Gerald C. Robinson*

Gerald C. Robinson, Esq.  (MN Bar No. 0212787)
80 South 8th Street, Suite 4700
Minneapolis, MN 55402
T: 877-448-0492
F: 612-338-4878
grobinson@nka.com

**THE BROOKS LAW FIRM, LLC**

Ross B. Brooks, Esq.*
Alastair J.M. Findeis, Esq.*
173 Huguenot Street, Suite 200
New Rochelle, NY 10801
T: (914) 821-6717
F: (914) 363-8723
ross@brooksllc.com
alastair@brooksllc.com

**ANIMAL LEGAL DEFENSE FUND**

Daniel H. Waltz, Esq.*
The Yard
700 Pennsylvania Ave., SE
Washington, DC 20003
707-795-2533 ext. 1066
dwaltz@aldf.org

Emily Stewart, Esq.*
769 Broadway #1209
New York, NY 10003

T: 707-795-2533 ext. 1028
F: 707-795-7280
estewart@aldf.org

(* *pro hac vice* application forthcoming)

*Counsel for Relator Animal Legal Defense Fund*

51