UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANIMAL LEGAL DEFENSE FUND, <br><br> Plaintiff, <br><br> v. <br><br> HOLDEN FARMS, INC., <br><br> Defendant. | Civil No. 21-2061 (JRT/DJF) <br><br><br> **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

Kristen Elise Rau, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff United States of America.

Alastair John MacKinnon Findeis and Ross B. Brooks, **BROOKS LLC**, 173 Huguenot Street, Suite 200, New Rochelle, NY 10801; Daniel Waltz, **ANIMAL LEGAL DEFENSE FUND**, 611 Pennsylvania Avenue Southeast, Number 484, Washington, DC 20003; Emily R. Stewart, **ANIMAL LEGAL DEFENSE FUND**, 767 Broadway, Number 1209, New York, NY 10003; Gerald Charles Pierre Robinson, Matthew H. Morgan, and Rebekah L. Bailey, **NICHOLS KASTER PLLP**, 4700 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Relator Animal Legal Defense Fund.

Dustan J. Cross and Matthew C. Berger, **GISLASON & HUNTER LLP – NEW ULM**, PO Box 458, New Ulm, MN 56073, for Defendant.

Defendant Holden Farms, Inc. ("Holden"), a Minnesota pork producer, applied for a loan under the Paycheck Protection Program ("PPP") during the COVID-19 pandemic. When applying, Holden certified that it was "not engaged in any activity that is illegal under federal, state or local law." Relator Animal Legal Defense Fund ("ALDF") brought

this action under the False Claims Act ("FCA"), claiming that Holden's attestation was false because Holden violated two Minnesota statues and the Swine Health Protection Act ("SHPA"), 7 U.S.C. § 3803, by engaging in inhumane and unsanitary pork production practices.

The PPP was a widespread, emergency measure designed to secure the economic wellbeing of businesses and employees, not police agricultural laws. Accordingly, Holden's alleged legal missteps were not material to the government's PPP issuance and the Court will grant Holden's motion and dismiss this action with prejudice.

## BACKGROUND

### I.     FACTS

Holden is a family-owned and managed pork producer with 76 employees and a herd of 70,000 sows across various Minnesota locations. (1st Am. Compl. ("Compl.") ¶¶ 17, 70, Aug. 11, 2023, Docket No. 30.) ALDF is an animal advocacy organization whose "charitable mission is to protect the lives and advance the interests of animals through the legal system." (*Id.* ¶ 22.)

Holden unwittingly hired and employed for five months an undercover ALDF investigator. (*Id.* ¶ 88.) The undercover employee documented animal cruelty, neglect, and instances of "feedback" feeding, in which pig corpses and byproducts were fed to live pigs. (*Id.* ¶¶ 10–15, 88, 90, 143.) For purposes of this motion, Holden assumes that its conduct violated the SHPA and Minnesota's anti-cruelty and anti-garbage feeding laws.

Shortly after ALDF's undercover investigation concluded, the COVID-19 pandemic swept through the United States.  (*Id.* ¶¶ 3–4, 88.)  In response, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, a centerpiece of which was the PPP.  (*Id.* ¶ 3.)  The PPP was adopted to cope with the economic havoc caused by the pandemic, providing employees and small businesses with a lifeline.  (*See id.* ¶ 3); *Bam Navigation, LLC v. Wells Fargo & Co.*, No. 20-1345, 2021 WL 533692, at *1 (D. Minn. Feb. 12, 2021).

Holden applied for a $2.57 million loan under the PPP which the Small Business Association ("SBA") approved and, ultimately, forgave.  (Compl. ¶ 4.)   Holden's loan application contained a certification that "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."  (PPP Appl. at 2.)

## II.   PROCEDURAL HISTORY

ALDF initiated a qui tam civil action under the FCA, alleging that Holden falsely attested to following all laws because its practices violated the SHPA and Minnesota's anti-cruelty and anti-garbage feeding laws.  (Compl. ¶ 7.)  The United States declined to intervene.  (*See* Order, July 13, 2023, Docket No. 23.)[1]  Holden now moves to dismiss

---

[1] Although the government's notice of non-intervention and the Court's subsequent order indicated the Court would solicit the government's written consent before dismissing, "the Attorney General's consent is required only where the relator seeks a voluntary dismissal, not where, as here, the district court grants a motion by the defendant to dismiss for failure to state a claim." (Notice of Election to Decline Intervention at 1, July 3, 2023, Docket No. 20.); *United States ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932, 934 (8th Cir. 2001).

because the alleged false attestation was not material to the government's lending decision.²

## DISCUSSION

### I. STANDARD OF REVIEW

#### A. Rule 12(b)(6)

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the Complaint as true to determine if the Complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the Complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or mere "labels and conclusions or a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (quotation omitted). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

² Because materiality disposes of this action, the Court will not address the parties' disagreements over Holden's knowledge.

At the motion to dismiss stage, the Court may consider the allegations in the Complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). The Court may also consider matters of public record and exhibits attached to the pleadings, as long as those documents do not conflict with the Complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

### B.   The False Claims Act and Rule 9(b)

The FCA creates civil liability to the United States for someone who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." 31 U.S.C. § 3729(a)(1). The FCA allows a private person to bring a so-called "qui tam" civil action for violation of this section in the name of the United States Government. *Id*. § 3730(b)(1).

Claims under the FCA are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, a relator must plead facts such as "the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Thayer v. Planned Parenthood of the Heartland, Inc.*, 11 F.4th 934, 939 (8th Cir. 2021). At the same

time, "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## II. ANALYSIS

The alleged false statement was not material; thus, no FCA liability follows. 31 U.S.C. § 3729(b)(4) defines as material any statement "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[3] Notwithstanding the lenient statutory language, the Supreme Court has characterized the materiality inquiry as "rigorous" and "demanding." *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 194 (2016). Materiality may be resolved on the pleadings. *See id.* at 195 n.6.

In *Escobar*, the Supreme Court engaged in its most fulsome discussion of the materiality requirement. Both the general principles *Escobar* espoused and its specific teachings on how to apply the materiality requirement counsel dismissal of this action.

Beginning with broad principles, the unanimous opinion is replete with warnings that the FCA "is not 'an all-purpose antifraud statute,'" nor is it "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194 (quotation omitted). Indeed,

> [a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as

---

[3] The materiality requirement applies equally to claims under 31 U.S.C. §§ 3729(a)(1)(A) and (B). *See Thayer*, 11 F.4th at 938.

> a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial. . . . In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.

*Id.* The decision proceeds:

> [I]f the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability.

*Id.* 196.

Under *Escobar*, then, Holden is not liable under the FCA simply by virtue of its attestation that it complied with all laws. ALDF brings precisely the action the Supreme Court warned against, using an all-encompassing certification of legality to ensnare Holden in FCA liability. Thus, the Court will proceed with skepticism while still evaluating whether, under the totality of the circumstances, Holden's noncompliance was material. *See United States ex rel. Int'l Bhd. of Elec. Workers Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 342 (3d Cir. 2021) (materiality is a "holistic, totality-of-the-circumstances" inquiry). *Escobar* establishes a non-exclusive list of factors a court may consider when evaluating materiality. *See Escobar*, 579 U.S. at 194–95. Particularly relevant to this

-7-

action are whether the violated condition went to the essence of the bargain, and the government's response in like cases.

### A. Essence of the Bargain

Rather than going "to the very essence of the bargain," the violation alleged here was entirely unrelated. *Id.* at 193–94 & n.5. That is, Holden's noncompliance with agricultural laws was too far afield from the purpose of the PPP to sustain an FCA claim.

The PPP was implemented to support employees and businesses through the early stages of the COVID-19 pandemic.[4] It was administered by the Small Business Administration and covered a wide range of enterprises, irrespective of their industries. *See* Keeping American Workers Paid and Employed Act, Pub. L. No. 116-136, 134 Stat. 281 § 1102(a)(2)(D) (codified at 15 U.S.C. § 636(a)(36)(D)). As instructed by the purpose of the PPP and Holden's application for the loans, the essence of the bargain was that loans would be issued (and ultimately forgiven) in exchange for businesses using the funds to keep themselves and their employees afloat. The general certification of compliance with all laws does not reasonably insert considerations of agricultural law into the contemplated bargain. Because ALDF does not allege Holden used the PPP funds for

---

[4] *See, e.g.*, U.S. Dep't of the Treasury, *Paycheck Protection Program*, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program (last accessed Apr. 16, 2024) ("The Paycheck Protection Program is providing small businesses with the resources they need to maintain their payroll, hire back employees who may have been laid off, and cover applicable overhead."); U.S. Small Bus. Admin., *PPP Myth vs. Fact*, https://www.sba.gov/document/support-ppp-myth-vs-fact (last accessed Apr. 16, 2024) ("Every facet of PPP was designed to keep Americans employed.")

anything other than payroll and other covered business expenses, it does not plausibly allege that Holden deprived the government of the benefit of the contemplated bargain.

ALDF alleges that any legal noncompliance undermines an entity's creditworthiness and is thus material to the SBA's lending decisions.  But that would reestablish FCA liability for any violation of "the entire U.S. Code and Code of Federal Regulations," contrary to the Supreme Court's warnings.  *See Escobar*, 579 U.S. at 196.  Regardless, where forgiveness was anticipated and the "loans" were, in effect, gifts, creditworthiness is of less concern.  *See* 15 U.S.C. § 636(37)(J).

ALDF also tries to salvage materiality by tying Holden's noncompliance with anti-garbage feeding laws to zoonotic disease prevention efforts.  To be sure, many arms of the federal government were vigorously fighting COVID-19, a zoonotic disease, at the time.  But there is no evidence whatsoever that the PPP was concerned with promoting public health.  It would be passing strange for Congress to assign administration of a program that was so concerned to the SBA.  Moreover, ALDF does not provide any reason to believe the government was concerned with preventing the emergence of a **new** zoonotic disease as compared to fighting the **existing** pandemic.  And even if ALDF could surmount all of these issues, that would salvage only its claims under the garbage feeding laws; ALDF provides no reason to believe allegations of animal cruelty would be material.

Ultimately, Holden's alleged violations of an all-encompassing legal attestation do not cut to the heart of the PPP bargain when the violations were unrelated to the economic focus of the program.

### B.     Government Response

*Escobar* identifies two inverse inferences of materiality based on government conduct. *See* 579 U.S. at 195. If "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," that is strong evidence the requirement is material. *Id.* Conversely, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.*

Beginning with government refusal to pay claims when it learns of noncompliance, ALDF alleges materiality "is evidenced by the fact that the Department of Justice ("DOJ") has brought enforcement actions against PPP borrowers who were in violation of laws governing their industry." (Compl. ¶ 62.) ALDF cites two instances in which DOJ took action, in part, based on a false certification that the borrower was "not in violation of any laws" when applying for a PPP loan. (*Id.* ¶ 63.)

Those DOJ actions are hardly evidence of consistent refusals to pay "in the mine run of cases based on noncompliance" with the PPP certification. *See Escobar*, 579 U.S. at 195. Rather, they are two instances when DOJ tacked on FCA claims to much more substantial charges of fraud. (*See* Compl. ¶ 63.) In the first case, the government added

the PPP fraud allegations onto criminal charges for money laundering and fraudulent medical billing. (*See id.*) In the second, the centerpiece was again fraudulent medical billing, with the PPP false statement also noted. (*Id.*) ALDF fails to identify any instance, nor is the Court able to find one, when the government has pursued a PPP borrower solely because a business falsely attested to the general legality of its operations.

On the contrary, there is good reason to believe the government regularly paid similar claims despite knowing that the legality requirement was violated. *See Escobar*, 579 U.S. at 195. The SBA issued approximately 11.5 million PPP loans and forgave 10.6 million. *See* Pandemic Response Accountability Committee, *Paycheck Protection Program* (Oct. 23, 2023), https://www.pandemicoversight.gov/data-interactive-tools/interactive-dashboards/paycheck-protection-program. Those loans were issued to "provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program." 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020). As such, SBA allowed "lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and . . . to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness." *Id.*

Even under the most ideal circumstances, it is inconceivable that the government would assume that 11.5 million businesses across any number of industries would comply with all governing laws and regulations, no matter how significant. *Cf. Nieves v. Bartlett*,

139 S. Ct. 1715, 1730 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[C]riminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something."). That proposition is even less conceivable when the government adopted an expedited process that bypassed usual diligence. The government must have known that some loan recipients would run afoul of their broad attestation of legal compliance, yet it still dispersed nearly $800 billion under the PPP with minimal oversight.[5]  *See* Pandemic Response Accountability Committee, *Paycheck Protection Program*. Under these circumstances, the government did not view as material regulatory violations that technically ran afoul of the loan certification language.

Finally, there is the matter of this specific loan. The SBA reserved the right to require repayment of misused PPP loans but has not done so here. *See* 85 Fed. Reg. at 20814.[6] Even after ALDF's reporting and lawsuit against Holden, it still forgave Holden's loan.

---

[5] To be sure, *Escobar* spoke of "actual knowledge" that requirements were violated, while the Court's analysis here is of constructive knowledge. 579 U.S. at 195. But *Escobar*'s list of materiality factors was not exclusive, and the level of constructive knowledge is so high here that it is as convincing to the Court as actual knowledge would have been.

[6] Whether the SBA has declined to recoup the money is a different question than whether the United States intervened in this suit. The parties debate the significance of a recent Eighth Circuit decision that notes "[a]t least two of our sister circuits have observed that the United States's refusal to intervene in a qui tam FCA case indicates the relator's case is weak." *United States ex rel. Kraemer v. United Dairies, L.L.P.*, 82 F.4th 595, 606 n.7 (8th Cir. 2023); *but see id.* at 607 (Colloton, J., concurring in the judgment) (observing that materiality, and thus the significance of the government's non-intervention, was not properly before the court and should

## CONCLUSION

In sum, both the general tenor of this action and the totality of the circumstances indicate the alleged false claim was not material to the government's PPP decisions. Because ALDF does not allege that Holden violated a material term of its PPP loan agreement, the Court will dismiss this action with prejudice.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Docket No. 46] is **GRANTED** and this action is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  May 24, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

---

not have been decided).  The Court will not wade into that debate because it would not alter the outcome of this case.